## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 24-CR-281-APM |
| | ) | |
| YELAKE MESERETU, | ) | |
| | ) | |
| Defendant. | ) | |

## YELAKE MESERETU'S POSITION ON SENTENCING

Yelake Meseretu stands before the court for sentencing as a 41-year-old first-time offender. Other than the conduct at issue in the September 2025 trial over which the Court presided, Mr. Meseretu has lived an exemplary life. His family immigrated to the United States from Ethiopia when he was six years old to pursue better opportunities. Once in America, Mr. Meseretu worked hard to learn English and obtain a degree from the Ohio State University. He founded his own business selling office supplies. And over the next nearly two decades, he expanded that business to the point where he could bring in his brothers as co-owners and managers, purchase delivery trucks, hire additional employees, and support a variety of D.C. government agencies, including the D.C. Public Schools ("DCPS"). Mr. Meseretu's most important life development came recently, when he had the joy and privilege of starting a family; he and his wife welcomed their first child, a son, in January 2024.

Mr. Meseretu exercised poor judgment in his association and relationship with Patricia Bailey. Based on the evidence at trial, a jury convicted Mr. Meseretu of three of the six counts in the indictment. These three counts relate to an alleged bribery

scheme involving Mr. Meseretu's office supplies business and DCPS. For purposes of sentencing under 18 U.S.C. § 3553(a), these crimes of conviction, while serious, must be viewed within the larger context of Mr. Meseretu's otherwise law-abiding, honest, hardworking, and family-driven life.[1]  Notably, the jury acquitted Mr. Meseretu of three counts in the indictment, finding that his involvement in the alleged bribery scheme was far more limited than the Government claimed.

In determining a reasonable sentence, we ask that the Court consider the damaging consequences that Mr. Meseretu's convictions have already caused for him and his young family. Because of his convictions, Mr. Meseretu has given up the business he founded and to which he dedicated his entire adult life. The District's Office of Contracting and Procurement has suspended Mr. Meseretu from doing business with the District (an action that Mr. Meseretu did not oppose) and will debar him in the near future. The convictions have tarnished Mr. Meseretu's reputation and the reputation of his company in the community. And, finally, years of investigation and the trial and resulting convictions have taken an emotional and financial toll on his entire family.

For the reasons set forth herein, we respectfully submit that a sentence of a significant term of probation, conditioned on six months of home confinement, is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.

---

[1] Many of the individuals who know Mr. Meseretu best have written letters to the Court. We have consolidated and attached those letters as Attachment 1.

## I.    THE ADVISORY SENTENCING GUIDELINES RANGE

Mr. Meseretu agrees with the Sentencing Guidelines calculation contained in the Presentence Investigation Report ("PSR") with one caveat. As the PSR reflects, Mr. Meseretu objected to the draft PSR on the ground that the loss amount for his convicted conduct should be less than $6,500, because the Government did not offer any testimony or evidence at trial that the $10,000 withdrawn from a US Office Solutions bank account in May 2021 went to Patricia Bailey and/or Dana Garnett. The Probation Officer invited the Court to make factual findings on this issue:

> Probation Officer's Response – According to the Notice Regarding Potential Loss Calculation [ECF# 155], defendant Meseretu paid coconspirator Garnett $10,000 for custodial and office supplies for Cardozo High School in May 2021. Pursuant to USSG §6A1.3, the Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case. The Court, who presided over the trial, is in the best posture to determine factual matters concerning the representations made at trial. For these reasons, the report remains unchanged regarding this matter.

PSR 26.

Mr. Meseretu asks the Court to find that the loss amount attributable to him is less than $6500. With respect to the allegations of Count Five, Patricia Bailey did not testify about receiving *anything* in connection with the charged transaction, let alone specify a monetary amount. The only evidence presented at trial was that someone withdrew $5,000 on two separate occasions from a US Office Solutions bank account in late May 2021. While the jury found that there was sufficient evidence to convict on this count, there is no evidence that Ms. Bailey received at least $6,500 related to these two withdrawals. Mr. Meseretu therefore respectfully submits that

3

the appropriate "loss" for his convicted conduct should be less than $6,500 and his offense level should be 12. With Mr. Meseretu's uncontested criminal history category of I (based on no criminal history whatsoever), the advisory Sentencing Guideline Range is 10 to 16 months.

As this Court well knows, calculating the advisory Guidelines range is only the first step in the federal sentencing process. *See Gall v. United States*, 552 U.S. 38 (2007). After calculating the advisory Guidelines range, the Court must determine whether to apply any Guidelines-based departures to adjust the applicable Guidelines range. *Id*. Once the final advisory Guidelines range is determined, the Court then must consider the factors set forth in 18 U.S.C. § 3553(a) and decide whether the circumstances and features of the case and the defendant warrant a variance from the Guidelines. *Id*.

The Probation Officer who prepared the PSR has recommended a downward variance from her calculated advisory Sentencing Guidelines range (15 to 21 months) to a sentence of 6 months. As already noted, Mr. Meseretu submits that the correctly calculated advisory Guidelines range is 10 to 16 months, and he agrees with the Probation Officer that a downward variance is justified. We thus turn to the factors set forth in 18 U.S.C. § 3553(a). For all the reasons discussed below, we submit that the § 3553(a) factors support a downward variance to a significant term of probation conditioned on six months of home confinement.

## II.    18 U.S.C. § 3553(a) FACTORS

In the post-*Booker* era in which the Sentencing Guidelines are advisory and not mandatory, the sentencing court's duty is to consider all the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute. Pursuant to the statute, the sentence imposed must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition, § 3553(a) requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to victim(s). 18 U.S.C. § 3553(a)(1)-(7). We submit that these statutory factors support the sentence requested by Mr. Meseretu.

### A.  The Nature And Circumstances Of The Offense

The Court is familiar with the nature and circumstances of Mr. Meseretu's offense of conviction, having presided over the September 2025 trial. Mr. Meseretu takes this opportunity to emphasize only a few points.

First, the jury acquitted Mr. Meseretu of three counts in the indictment, finding that his involvement in the alleged bribery scheme was far more limited than the Government claimed. As the Court knows, the Government's indictment focused on four specific factual allegations against Mr. Meseretu. A summary of those allegations is set forth below:

1.  ***September 2019*** (Garnett, Bailey, and Meseretu): DCPS purchased 75 cases of copy paper for $2,624.25. Mr. Meseretu allegedly paid $2,520 in cash to Ms. Garnett and Ms. Bailey and did not deliver the cases of copy paper.

2.  ***May 2021*** (Garnett, Bailey, and Meseretu): DCPS ordered two types of trash bag/can liners from Mr. Meseretu's company. Ms. Garnett allegedly coordinated with Mr. Meseretu to submit an inflated bid of $26,100 and deliver fewer goods than required, after which Mr. Meseretu allegedly withdrew $10,000 in cash to pay Ms. Garnett and Ms. Bailey.

3.  ***June 2021*** (Bailey and Meseretu): Mr. Meseretu allegedly paid Ms. Bailey $3,000 in cash for two orders totaling $5,623. The indictment does not allege that Mr. Meseretu failed to deliver on these orders.

4.  ***February and May 2023*** (Bailey and Meseretu): As part of a recorded sting operation, Ms. Bailey told Mr. Meseretu that she had "experienced a recent financial hardship" and allegedly "agreed to put in a copy paper order to allow Meseretu to pay Bailey $1,000." Mr. Meseretu allegedly paid the first $500 in February 2023 and the second $500 in May 2023. The indictment does not allege that Mr. Meseretu failed to deliver copy paper to DCPS.

The first three of these allegations are connected to specific counts in the indictment – Counts Four, Five, and Six. There is no count specifically tied to the fourth (February and May 2023) allegation. By acquitting Mr. Meseretu of Counts Four and Six (in addition to Count Two related to Dana Garnett), the jury found that the Government failed to prove its September 2019 and June 2021 allegations. While we do not know how the jury viewed the February and May 2023 allegation (because

the Government did not charge a count specifically tied to that alleged conduct), we do know that Mr. Meseretu's company delivered all the product associated with that order and that the Government's own witnesses described the payment Mr. Meseretu made to Ms. Bailey as a "gift" or a "thank you." As the defense showed at trial, FBI Agent Gano testified before the grand jury on August 29, 2024, that when Mr. Meseretu made the payment to Ms. Bailey, he (Mr. Meseretu) characterized the payment as a "gift." Def Ex. 111a. Ms. Bailey also acknowledged that during her FBI sting, Mr. Meseretu described the payment as a "thank you" and that when she offered to send him business in return for the payment, Mr. Meseretu replied "no, no, no, no, no, no, absolutely not." 9/18/25 Tr. 725-26 and 30.

Second, Mr. Meseretu acknowledges that he also was convicted of three counts. As context for the alleged conduct that led to Mr. Meseretu's convictions, we ask the Court to consider the background of his relationship with Ms. Bailey and how Ms. Bailey developed the scheme to solicit payments from vendors, including Mr. Meseretu.

For years, Mr. Meseretu and his company did business with DCPS, including Cardozo High School ("Cardozo"). Ms. Bailey was the Cardozo budget manager. By fulfilling orders for Cardozo, Mr. Meseretu developed a professional relationship with Ms. Bailey. Ms. Bailey testified that she and Mr. Meseretu had a "friendly relationship" and that she "like[d] Eli very much." 9/18/25 Tr. 631. For years before she developed the scheme that would lead to her downfall, Ms. Bailey described Mr. Meseretu and his company as one of her "better vendors" that was "reliable" and "had

good products" that were "delivered on time." *Id*. at 689. During all those years, Ms. Bailey testified that all their transactions were "aboveboard." *Id*.

At some point, after years of "aboveboard" work, Ms. Bailey and another DCPS official came up with a plan to solicit payments from several vendors that were providing supplies to Cardozo. Ms. Bailey acknowledged that the plan was a way of "taking advantage of the vendors." 9/18/25 Tr. 662. As the trial evidence showed, as part of this plan Ms. Bailey would approach Mr. Meseretu, inform him that she was experiencing personal financial troubles, and ask for help.[2] At times, Mr. Meseretu agreed to help her. In this regard, Mr. Meseretu exercised poor judgment in his association and relationship with Ms. Bailey.

While they have no personal knowledge of Mr. Meseretu's relationship with Ms. Bailey, many of the friends and family members who have written in support of Mr. Meseretu describe his generosity and the difficulty he has in saying "no" to someone in need. Mr. Meseretu's mother, Bizunesh Eshete, described how Mr. Meseretu "struggles to say no when someone is in need and never expects anything in return" and "believes in people and avoids speaking poorly of others." Mr. Meseretu's longtime friend, Abebual Fekade-Sellassie, wrote:

> Our conversations often revolve around our shared faith, our families, and the challenges of managing a business. Many times, Yelake has encouraged me to show patience and understanding toward employees

---

[2] On the February 2023 telephone calls, Ms. Bailey explained that she was having financial troubles and needed money to buy a new washing machine. FBI Agent Matthew Gano testified that "we asked her to just keep it normal to how they had previously discussed things." 9/16/25 Tr. 300.

who were struggling to meet expectations. His instinct is always to give people a chance, to support them, and to treat them with compassion.

Another longtime friend, Curt Fomengia, wrote:

> I have known Yelake since childhood, and throughout my life, he has consistently been one of the kindest and most generous people I know. From a very young age, he demonstrated compassion and a genuine concern for the well-being of others, especially family and close friends.

> Whenever my family faced difficult times or when I lost my sister, Yelake was always there to help. Without hesitation, he provided financial support when we were struggling and gave his time and guidance when we needed it most. His help was never conditional, and he never expected recognition or anything in return. He simply wanted to make sure those he cared about were okay.

> This generosity was not limited to me or my family. I have personally witnessed Yelake give both time and money to many friends when they were facing hardship or needed support. Whether someone was dealing with financial stress, personal challenges, or uncertainty about their next steps, Yelake consistently stepped in to help however he could.

We understand that Mr. Meseretu's generous character and sympathetic nature does not excuse the conduct that the jury determined to be a criminal offense. And, clearly, a jury found that with respect to the May 2021 transaction, Mr. Meseretu received some benefit for himself or his company in exchange for providing something of value to Ms. Bailey. However, we submit that the nature and circumstances of the offense, as found by the jury, include some mitigating features that render it somewhat less culpable than the more typical bribery case in which a private party approaches a government official and proposes a straightforward *quid pro quo* arrangement of business opportunities in exchange for money. Mr. Meseretu paid someone he knew well and who came to him asking for help.

## B. History And Characteristics Of The Defendant

Mr. Meseretu's personal history and characteristics provide strong support for our request for a downward variance to a sentence of a significant term of probation conditioned on six months of home confinement. Except for the conduct at issue in this case, Mr. Meseretu has lived an exemplary life. His difficult upbringing as an immigrant from Ethiopia, his pursuit of the American dream and founding of his own business, and his latest chapter as a father all support a downward variance.

### i.    *Mr. Meseretu's life as an immigrant from Ethiopia*

Mr. Meseretu was born in Ethiopia in 1984 to Amare Meseretu and Bizunesh Eshete and has two older brothers and a younger sister. When Mr. Meseretu was six years old, his family immigrated to the United States to pursue a better life and settled in Silver Spring, Maryland. Mr. Meseretu's father was an entrepreneur and started his own deli and catering business.  Mr. Meseretu's mother focused on raising Mr. Meseretu and his siblings.

Living in a new country was not easy. Mr. Meseretu did not speak English when he arrived in the United States and had to adapt to a new culture. Mr. Meseretu tackled these challenges with remarkable maturity and compassion for his young age. Mr. Meseretu's mother wrote in her letter to the Court:

> From a very young age, he showed a calm spirit, discipline, and an uncommon sense of responsibility. While raising my children in a new country came with many challenges, Yelake consistently stood out as a child who listened, worked hard, and made thoughtful choices. He was respectful at home, kind to others, and deeply committed to doing what was right.

Mr. Meseretu's mother went on to explain how "[e]ven as a young boy, [Mr. Meseretu] showed compassion for others by helping neighbors shovel snow and clear paths during harsh winters without ever being asked."

When Mr. Meseretu finished high school in Silver Spring, he followed his older brother, Kirubel Meseretu, to the Ohio State University in Columbus, Ohio, where he obtained a Bachelor of Science degree in Human Ecology. After graduating from Ohio State in 2007, Mr. Meseretu moved back to his parents' home in Maryland.

*ii.    Founding U.S. Office Solutions*

Around a year after graduating, Mr. Meseretu followed his father's entrepreneurial example and created his own company, an office supply company called U.S. Office Solutions. While an office supply company may sound mundane to some, it was not to Mr. Meseretu. Mr. Meseretu had a fond memory of looking through an office supply catalog that his father had given him as a boy. He was inspired by that experience and excited to enter the business.

In the early years, the business was just Mr. Meseretu. He worked around the clock and personally approached and cold-called a variety of private businesses and law firms for work. When he was lucky enough to find a customer, Mr. Meseretu personally delivered the office products in a van.

By 2009, Mr. Meseretu's company obtained its first business with local government agencies and public and charter schools. Mr. Meseretu quickly discovered that he could be flexible and meet the sometimes difficult needs of these customers. Mr. Meseretu's responsiveness to public agency needs created a niche for the business, and the business began to specialize in servicing the D.C. government.

Around 2011, Mr. Meseretu convinced his two older brothers, Surafel and Kirubel Meseretu, to join the business as full-time employees and co-owners. When the brothers joined the business, they each acquired a one-third ownership stake in the company. Creating a business that could support his family members was a significant source of pride for Mr. Meseretu. As the Court may have gleaned, Mr. Meseretu's family means everything to him, and the family supported Mr. Meseretu through their regular attendance at his trial. And as a testament to his family, Mr. Meseretu incorporated his business as SKY, LLC, which are the initials of the three Meseretu brothers – Surafel, Kirubel, and Yelake – years before the brothers joined the business.

When Mr. Meseretu's brothers joined the business, it was still small. The three brothers worked out of a warehouse surrounded by the supplies they would deliver to their customers. During the winters, they huddled around space heaters for warmth as they worked together to fulfill orders.

Over time, the Meseretu brothers built a strong positive reputation for the business through its reliable service and quick deliveries. Around 2013 and 2014, the business grew significantly, largely through word of mouth from satisfied customers. Many satisfied customers would recommend Mr. Meseretu's company when they moved from one agency or school to another.

As the company became profitable, it was able to purchase its own delivery trucks and hire additional full-time employees to assist in servicing customers and delivering products. The company also began to expand the types of products it

offered from only office supplies to furniture, cleaning supplies, and networking/network loops.

One of Mr. Meseretu's satisfied customers, Donald Hense, the founder and Chairman of Friendship Public Charter Schools, wrote about his relationship with Mr. Meseretu in his letter to the Court:

> Mr. Meseretu's company bid to provide furniture for our schools. During this time U.S. Office Solutions followed the guidelines for bidding on RFPs as prescribed by the DC Public Charter School Board. His company always performed above and beyond the call of duty. At important Friendship events Mr. Meseretu attended those events and often brought members of his family. I have personally met his parents and all of his brothers.

> What I admire most about Mr. Meseretu [is] his attention to detail and his no excuses performance. I have seen Mr. Meseretu on his knees personally putting furniture together in order to meet a deadline of opening day (school). It is my sincere belief that Mr. Meseretu is an honorable man with whom I am proud to associate.

It is an understatement to say that Mr. Meseretu was passionate about the business he built over the last nearly two decades. Mr. Meseretu took entrepreneurial pride in watching the business grow and also believed that his company made a real difference for kids in the DCPS and charter schools. Mr. Meseretu and his company frequently gave back to and supported District schools in a variety of ways. For example, his company donated furniture to charter schools that were underfunded, sponsored back-to-school giveaways to support schools and their students, donated backpacks to homeless DCPS students, donated funds during "Giving Tuesday" to support care packages for District students going to college, and donated hand sanitizer and facemasks to schools in Arkansas and the District during the COVID-19 pandemic. Because of his criminal convictions, Mr. Meseretu has had to separate

from the business he founded and led for his entire adult life. The loss of his business, while foreseeable in the circumstances, is exceptionally painful for Mr. Meseretu.

### iii.    Mr. Meseretu's role in supporting his family

In determining the appropriate sentence, the Court should also consider the critical role Mr. Meseretu plays in his young family, and particularly as a father to his now two-year-old son. On September 20, 2021, Mr. Meseretu married Kabaye Getachew Diriba, who works full-time as a Public Health Analyst for the U.S. Department of Health and Human Services. In January 2024, while Mr. Meseretu was under investigation and several months before he was indicted, the couple welcomed their first child to the world. Their son just turned two years old.

Mr. Meseretu's wife has written a letter to the Court about her marriage and Mr. Meseretu's role as a father:

> In this letter, I would like to describe to you the person I know and deeply admire, someone who is devoted to his community and those he cares for and shows it through his actions every day. Though there are countless examples of how he displays these qualities, I would like to highlight a few.
>
> I met Yelake over 10 years ago through a mutual friend. From the very beginning, I was struck by his genuine kindness toward others and by the depth of his love for his family, especially the younger members. We were married in 2021 and welcomed our child in 2024, milestones that deepened my appreciation for who Yelake is at his core.
>
> During the birth of our child, Yelake displayed his commitment to those he cared for in the most profound way. He stayed awake for more than 24 hours, never leaving my side, determined to serve as my advocate during a vulnerable and uncertain time. As complications arose, he became my steady calm, thoughtfully updating our parents and reaching out to his medical friends for guidance to ensure that every decision was an informed one. In that moment, and countless others, Yelake demonstrated the depth of his love, sense of responsibility, and his instinct to protect those he cares for.

The way he shows up as a father is no different. He is incredibly thoughtful about our son's needs, from long term one's, such as carefully planning for his academic future, to the small but meaningful details, like ordering the next size shoe before they are needed.

Yelake carries a profound sense of responsibility, one that is expressed through consistent action rather than words. He supports me as a mother and helps me be the best version of myself, often stepping in and easing my load when he recognizes that my capacity is limited. His attentiveness and care extend far beyond our immediate family, to our neighbors, friends, church, broader community, and extended family. . .

Further, Mr. Meseretu's wife conveyed to the PSR writer how difficult it has been for them to raise a baby under the challenging circumstances of a criminal case and her fear of caring for their child alone if Mr. Meseretu were incarcerated:

Ms. Diriba explained that the instant offense has been "life changing," particularly from a "quality of life and mental health perspective." She indicated they have leaned on each other and their family for support during this difficult time. Ms. Diriba stated that they have tried to shelter their son from his father's court ordeal, but children can sense behavioral changes in their parents. She conveyed a custodial sentence would "break us." Ms. Diriba stated, "I would not know how to explain to him [son] where his dad is, or what happened." Lastly, Ms. Diriba reiterated her husband plays an important role in her and their son lives, but he is an "anchor" to others, including his parents, siblings and friends.

PSR ¶ 83.

Section 5H1.6 of the Sentencing Guidelines (Policy Statement on "Family Ties and Responsibilities") recognizes the Court's discretion to grant a downward Guidelines departure if the defendant's service of a sentence within the applicable Guidelines range would cause a loss of essential caretaking or financial support to the defendant's family. The Court's focus should be on the "effect of the defendant's absence on his family members." *United States v. Schroeder*, 536 F.3d 746, 756 (7th Cir. 2008) (citing *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) ("The

rationale for a downward departure here is not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing.")).

Regarding the three non-exhaustive general considerations listed in Application Note 1(A) to the Policy Statement, including the "seriousness of the offense," we submit that while Mr. Meseretu's crime of conviction is serious, it is not serious to a degree that should preclude consideration of the impact that his absence would have on essential caretaking within his family. The remaining two considerations are inapplicable, as Mr. Meseretu's wife and young child were not involved in his offense and there was never any risk of danger to Mr. Meseretu's family as a result of the offense.

As for those factors expressed in Application Note 1(B), we submit that a sentence of incarceration would "cause a substantial, direct, and specific loss of essential caretaking, or essential financial support" to Mr. Meseretu's two-year-old son. Mr. Meseretu's wife works full-time, and they share responsibilities for raising their toddler son. We respectfully submit that Mr. Meseretu's incarceration would wreak harm on his young family and that this impact should be considered a strong basis for imposing a non-custodial sentence either through application of a downward departure under U.S.S.G. § 5H1.6 or through exercise of the Court's discretion to grant a downward variance from the applicable advisory Guidelines range.

We submit that Mr. Meseretu's exemplary life and the critical role he plays in caring for his family and young son support a sentence of a significant term of probation, conditioned on six months of home confinement. Such a sentence is sufficient to serve the purposes of sentencing and would also avoid inflicting additional and unnecessary harm on Mr. Meseretu's young family.

### C. The Need To Avoid Unwarranted Sentencing Disparity

A sentence of a significant term of probation conditioned on six months of home confinement would not create unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

The other two vendors who were convicted of engaging in bribery schemes with Ms. Bailey – Duane King and Donald McWhirter – each received probationary sentences. While those defendants pled guilty and received the benefit of cooperation, their crimes also were significantly more egregious than Mr. Meseretu's.

After accounting for acceptance of responsibility, Duane King's offense level under the Sentencing Guidelines was 25, which included enhancements for, among other things, a loss amount of between $250,000 and $550,000 and obstruction of justice. *United States v. King*, case no. 1:23-cr-00319-APM, ECF 5. This offense level resulted in an advisory Sentencing Guidelines range of 57 to 71 months. Mr. King received a sentence of 36 months of probation. As part of Mr. King's plea, he acknowledged receiving personal profit of at least $61,250 from the bribery schemes. *Id*. at ECF 6. And at Ms. Garnett's trial, the Government reviewed hundreds of text messages between Mr. King and Ms. Bailey detailing numerous explicit bribery

payments.[3] In contrast, there were no text messages between Ms. Bailey and Mr. Meseretu in connection with the counts for which Mr. Meseretu was convicted and only five text messages in total between the two of them. *See* Govt Ex. 303.

Similarly, after accounting for acceptance of responsibility, Donald McWhirter's offense level under the Sentencing Guidelines was 17, which included an enhancement for a loss amount between $40,000 and $95,000. *United States v. Donald McWhirter*, case no. 1:24-cr-00280-APM, at ECF 5. This offense level resulted in an advisory Sentencing Guideline range of 24 to 30 months. Mr. McWhirter received a sentence of 24 months of probation. As part of McWhirter's plea agreement, he acknowledged receiving personal profit of at least $50,000 from the bribery schemes. *Id*. at ECF 6.

Further, as explained in the PSR:

During the last five fiscal years (FY2020-2024), there were 6 defendants whose primary guideline was §2C1.1, with a Final Offense Level of 14 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 4 defendants (67%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 7 month(s) and the median length of imprisonment imposed was 6 month(s). For all 6 defendants in the cell, the average sentence imposed was 5 month(s) and the median sentence imposed was 5 month(s).

PSR ¶ 137. Importantly, 33 percent of the defendants in this position were not sentenced to any imprisonment. *Id*.

---

[3] *See* Govt Ex. 301 from Ms. Garnett's trial (containing 626 text messages between Duane King and Patricia Bailey); *see also* 6/20/25 Tr. 704-725 (Ms. Bailey's Testimony at Ms. Garnett's trial).

These statistics drop dramatically when you look at similarly situated defendants with a Sentencing Guidelines offense level of 12, which (as previously discussed) we believe is the correct offense level in this case:

> During the last five fiscal years (FY2020-2024), there were 23 defendants whose primary guideline was §2C1.1, with a Final Offense Level of 12 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 8 defendants (35%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 2 month(s) and the median length of imprisonment imposed was 0 month(s).

United States Sentencing Commission's Judiciary Sentencing Information (JSIN), available at: https://jsin.ussc.gov/analytics/saw.dll?Dashboard. ***Here, 65 percent of the defendants in this position were not sentenced to any imprisonment.***

Given these statistics and the probationary sentences imposed in the more factually egregious cases of Mr. King and Mr. McWhirter, a sentence of a significant term of probation, conditioned on six months of home confinement, for Mr. Meseretu would fall in line with sentences imposed on similar, if not more serious, offenders, especially after taking into account mitigating facts about the nature and circumstances of Mr. Meseretu's offense, his exemplary life, and the critical role he plays in caring for his young family and son.

### D. The Need To Provide Restitution To Victims

Restitution is not applicable given the fact that the Court did not impose restitution on the related cases of Dana Garnett, Duane King, and Donald McWhirter, each of which involved significantly larger loss amounts and defendants who profited significantly from their bribery schemes.

### III.    A SENTENCE OF A SIGNIFICANT TERM OF PROBATION, CONDITIONED ON SIX MONTHS OF HOME CONFINEMENT, WILL SERVE THE PURPOSES OF FEDERAL SENTENCING

As noted earlier, Congress has identified four purposes of federal sentencing that must guide district courts in selecting a sentence within the statutory penalty range.  The sentence must be "sufficient but not greater than" to serve those purposes which are, in brief, to promote just punishment, deterrence, protection of the public, and rehabilitation.  With these guideposts in mind, we respectfully submit that a sentence of a significant term of probation conditioned on six months of home confinement fully serves the purposes of federal sentencing.

As to just punishment, Mr. Meseretu's convictions have already exacted a high personal price from Mr. Meseretu and his young family. Because of his convictions, Mr. Meseretu had to give up the business he founded as a young college graduate and to which he has dedicated his entire professional life. Further, Mr. Meseretu will not be able to perform work with the District of Columbia for an extended period of time. The District's Office of Contracting and Procurement has suspended Mr. Meseretu from doing business with the District, an action that Mr. Meseretu did not oppose, and will debar him in the near future. The conviction has significantly tarnished Mr. Meseretu's reputation and the reputation of his company in the community. Going forward, he will face all the stigma and consequences that accompany felony convictions. His family, many of his close friends, and members of the community are aware of these charges and of his conviction at trial. These consequences, combined with the sentence of home confinement and probation that we propose, would provide just punishment for Mr. Meseretu and sufficient specific deterrence.  Incarceration of

Mr. Meseretu would be punishment that is "greater than necessary" to achieve federal sentencing purposes.

The public does not need any further protection from Mr. Meseretu, nor is there reason to believe he will reoffend. Because of his conviction, suspension from doing business with the District, and impending debarment, Mr. Meseretu will not be doing business with the District for a significant period of time.

Further, Mr. Meseretu is at low risk of reoffending based on available empirical evidence. According to the United States Sentencing Commission, a Criminal History Category I offender over the age of 40, like Mr. Meseretu, has a historical general recidivism rate of 6.9%.[4]

Although general deterrence remains a required consideration under § 3553(a), there is little evidence to support a finding that harsh sentences deter future criminal conduct. The unique combination of motivation and circumstances that lead otherwise law-abiding citizens to risk prosecution and imprisonment are not so easily overcome by the simple imposition of lengthy sentences. While such a theory might be appealing on its face, the reality is that there is little to no difference in the

---

[4] *See* U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28 Ex. 9 (2004) (listing the recidivism rates for various types of offenders and considering demographics such as gender, age, race, drug use, marital status, etc.), available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

deterrent effect between probation and imprisonment.[5] Indeed, available research suggests that the certainty of being caught and punished carries for greater deterrent effect than the severity of the punishment.[6]

A sentence of a significant term of probation, conditioned on six months of home confinement, is further supported by Mr. Meseretu's exemplary life and the critical role he plays in caring for his young family and son. The requested sentence adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.

---

[5] *See* Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 PRISON J. 48S, 50S-51S (2011) (according to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions"); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

[6] *See* David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 CRIMINOLOGY 587 (1995); see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); *see also* Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective deterrent."), available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/cPlenaryI.pdf.

## CONCLUSION

For the foregoing reasons and any other that may appear to the Court or that may develop at the sentencing hearing, Mr. Meseretu asks this Court to sentence him to a significant term of probation, conditioned on six months of home confinement.

Respectfully submitted,


/s/ *Noah Cherry*
Noah Cherry (No. 1742964)
David Schertler (No. 367203)
Schertler Onorato Mead Sears
& Manning
555 13th Street, N.W., Suite 500 West
Washington, D.C.  20004
Telephone:  (202) 628-4199
dschertler@schertlerlaw.com
ncherry@schertlerlaw.com

*Counsel for Yelake Meseretu*

23

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of January 2026, I electronically filed a true copy of the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all parties.

/s/ Noah Cherry
Noah Cherry (No. 1742964)